IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| ARRI NICOLE CHAVEZ, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| JEFFERSON COUNTY, TEXAS; | § | |
| BRITTANY A. BANKS; SARAH E. | § | CIVIL ACTION NO.  1:22-CV-00257 |
| COOPER; BRADFORD E. LOWE JR.; | § | JUDGE MICHAEL J. TRUNCALE |
| LISA L. MARSHALL; AARON W. | § | |
| MORRIS; PAULA G. OGAZI; CITY OF | § | |
| BEAUMONT, TEXAS; RYAN M. | § | |
| BARFIELD; ALEC H. GARCIA, JOHN E. | § | |
| POOLE; AND JOHN DOES 1-10, | § | |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pursuant to Rule 60(a) of the Federal Rules of Civil Procedure, the Court hereby strikes its previous Orders, [Dkts. 103, 104], and enters this Amended Order in their place.

Plaintiff Arri Nicole Chavez was sleeping in a cell at the Jefferson County jail when her cellmate, Andrea Renee Shelton, brutally attacked her. She brings this suit against Jefferson County, the City of Beaumont, the police officers who arrested her assailant, and several jail employees. She alleges that their actions, inaction, and policies proximately caused the attack in violation of her Fourteenth Amendment rights.

Before the Court are Defendants Ryan M. Barfield, Alec. H. Garcia, and John E. Poole (the "Beaumont Police Department Defendants")'s 12(b)(6) Motion to Dismiss [Dkt. 48], Defendants Paula G. Ogazi, Brittany A. Banks, Lisa L. Marshall, Bradford E. Lowe Jr., Sarah E. Cooper, and Aaron W. Morris (the "County Jailer Defendants")'s 12(b)(6) Motions to Dismiss Plaintiff's First Amended Complaint [Dkts. 37–42], and Defendant City of Beaumont (the "City")'s Rule 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint [Dkt. 59]. The

Defendants all seek to dismiss Plaintiff's First Amended Complaint (the "Complaint") [Dkt. 24].[1] For the reasons discussed below, the Court grants their motions.

## I.    BACKGROUND

On July 16, 2020, at approximately 8:30 P.M., Plaintiff was arrested, brought to the Jefferson County jail, and detained in a cell in the "book-in area" where the jail holds detainees "who have not completed book-in, and who have not been through classification."[2] [Dkt. 24 at 11, 28]. That same evening, Beaumont Police Department ("BPD") officers were dispatched to conduct a welfare check on a woman named Andrea Renee Shelton. *Id.* at 12. Before the officers arrived, witnesses at the scene informed dispatch that a woman—later identified as Ms. Shelton—struck a child with a pole. *Id.* After they arrived at the scene, the officers learned that Ms. Shelton had threatened to strike the witnesses with the pole before retreating to her residence where she struck her four-year-old daughter. *Id.* BPD officer, Defendant Ryan Barfield, documented in the probable cause affidavit (the "BPD Affidavit") that while talking with Ms. Shelton at the scene, "she appeared to be suffering from a narcotics induced psychotic episode" and "was speaking to herself and another party that was not there." *Id.* at 13. An officer at the scene also called Ms. Shelton's mother, who confirmed that Ms. Shelton has had mental health issues, including a "mental breakdown a few years before." *Id.* at 14–15. After further investigation, including taking witness statements, the BPD officers placed Ms. Shelton under arrest for intentionally causing bodily injury to a child and transported her to the Jefferson County jail. *Id.* at 13. In the BPD Affidavit, Officer Barfield noted his belief that Ms. Shelton "in

---

[1] Because the Beaumont Police Department Defendants' and County Jailer Defendants' motions to dismiss assert qualified immunity, the Court stayed all discovery in this matter pending the resolution of these motions. [Dkt. 83]; *see Carswell v. Camp*, 54 F.4th 307, 311 (5th Cir. 2022) ("Where public officials assert qualified immunity in a motion to dismiss, a district court must rule on the motion. It may not permit discovery against the immunity-asserting defendants before it rules on their defense.").

[2] The Complaint does not specify why Plaintiff was arrested or how she arrived at the jail. *See generally* [Dkt. 24].

her current state was unable to provide for her children" and that she was placed under arrest, at least in part, "to prevent further acts of family violence." *Id.*

BPD Defendants Barfield and Garcia brought Ms. Shelton into the Jefferson County jail at approximately 10:15 P.M. *Id.* at 19. At approximately 10:23 P.M., County Jailer Defendant Sarah Cooper placed Ms. Shelton in the same holding cell as Plaintiff, who was asleep. *Id.* at 25. Between 10:23 P.M. and 10:55 P.M., various County Jailer Defendants checked the cell a total of five times.[3] *See, e.g.*, [Dkt. 37-1]. The County Jailer Defendants also continued to book the detainees during this time. [Dkt. 24 at 19–21]. The booking process includes filling out numerous forms, including a Texas Commission on Judicial Standards ("TCJS") Screening Form for Suicide and Medical/Mental/Developmental Impairments and a Prison Rape Elimination Act form. *Id.* at 20–21. The process also includes running a "Continuity of Care Query," *id.* at 19, which is a database search to determine whether an inmate "previously received state mental healthcare or has a known intellectual or developmental disability." Tex. Admin. Code Ann. § 273.5. County Jailer Defendant Brittany A. Banks ran the Query on Ms. Shelton. [Dkt. 24 at 19].

---

[3] This is the only fact in this Background section that is not as alleged by Plaintiff in her Complaint. In her Complaint, Plaintiff references—but does not attach—the observation log for the cell that she shared with Ms. Shelton. *See, e.g.*, [Dkt. 24 at 31]. Plaintiff also misrepresents the observation log by not including several documented cell checks in her factual allegations. *Compare* [Dkt. 24 at 10–31] (Plaintiff's factual allegations) *with* [Dkt. 37-1] (full observation log). The County Jailer Defendants' Motions to Dismiss attach the full observation log for Plaintiff's cell, however. *See, e.g.*, [Dkt. 37-1]. The full log shows (in military time) that the County Jailers checked the cell at 9:11 P.M., 9:43 P.M., 9:52 P.M., 10:03 P.M., 10:07 P.M., 10:11 P.M., 10:23 P.M., 10:31 P.M., 10:37 P.M., 10:42 P.M., and 10:55 P.M. *Id.* Because Plaintiff references this observation log in her Complaint, *see, e.g.*, [Dkt. 24 at 31], and it is central to her claims, the Court may consider it in ruling on the County Jailer Defendants' 12(b)(6) motions. *See Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) ("The court's review [of a 12(b)(6) motion to dismiss] is limited to the complaint, any documents attached to the complaint, *and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint*.") (emphasis added). Plaintiff claims that she can reasonably infer that the County Jailer Defendants falsified the log, and argues that the Court therefore should not consider it. *See, e.g.*, [Dkt. 71 at 26–27]. Plaintiff's basis for this "inference" is that her counsel has encountered inaccurate and deliberately falsified jail records in other cases. *Id.* This does not support a reasonable inference that the County Jailer Defendants falsified records in this matter.

The Query results reflected that Ms. Shelton had previously received care for mental health issues. *Id.*

At approximately 11:03 P.M., County Jailer Defendant Bradford E. Lowe, Jr. found Ms. Shelton attacking Plaintiff in the cell. *Id.* at 20. He yelled to County Jailer Defendant Banks that "an inmate was being beaten up," and the two entered the cell and restrained Ms. Shelton. *Id.* Camera footage from the attack reveals that Ms. Shelton, apparently unprovoked, repeatedly kicked Plaintiff in the head while Plaintiff slept on the floor. *Id.* at 16. Specifically, Ms. Shelton kicked Plaintiff in the head thirteen times, then retreated from the camera's view, returned to kick Plaintiff three more times in the head, then retreated again from the camera's view before returning to kick Plaintiff one more time in the head. *Id.* Ms. Shelton then retreated from the camera's view once again before jumping in the air and landing on Plaintiff with both feet. *Id.* After retreating from the camera's view for the last time, Ms. Shelton jumped in the air and landed on Plaintiff with both feet four more times. *Id.* at 16–17. It is at this point that the footage shows jailers entering the cell and attempting to restrain Ms. Shelton. *Id.* at 17. But before the jailers successfully intervened and stopped the assault, Ms. Shelton grabbed Plaintiff by the hair and slammed her head into the concrete floor twice. *Id.* Following the assault, Plaintiff was life flighted to Herman Hospital in Houston, Texas. *Id.* She suffered extensive head injuries and facial fractures, and required intubation and multiple brain surgeries. *Id.* at 17–18.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Sonnier v. State Farm Mut. Auto. Ins. Co.,*

509 F.3d 673, 675 (5th Cir. 2007). While the Court must accept the well-pleaded facts in the complaint as true, it will "not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010). "The Court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain enough well-pleaded facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain: . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). A claim is "plausible on its face" when the well-pleaded facts allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### III.    QUALIFIED IMMUNITY

"Section 1983 creates a private right of action for redressing the violation of federal law by those acting under color of state law." *Olabisiomotosho v. City of Hous.*, 185 F.3d  521, 525 (5th Cir. 1999) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82 (1984)); *see*

5

42 U.S.C. § 1983. The statute "is not itself a source of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere." *Olabisiomotosho*, 185 F.3d at 525 (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc).[4] Once an official pleads the defense of qualified immunity, "the burden shifts to the plaintiff to rebut it." *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (quoting *Cousin v. Small*, 325 F.3d 627, 632 (5th Cir. 2003)). The qualified immunity defense has two prongs: (1) "whether an official's conduct violated a statutory or constitutional right of the plaintiff"; and (2) "whether the right was clearly established at the time of the violation." *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). The Court may rest its analysis on either prong. *Id.* (citing *Morgan*, 659 F.3d at 385).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotation marks omitted). Generally, to prove that a right is "clearly established," "[a] plaintiff must identify a case—usually, a body of relevant case law— in which an officer acting under similar circumstances was held to have violated the Constitution." *Roque v. Harvel*, 993 F.3d 325, 334 (5th Cir. 2021) (internal quotation marks omitted). "While a plaintiff need not find a case 'directly on point, . . . existing precedent must

---

[4] Plaintiff argues: "The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted. Congress makes laws. Courts do not. However, the qualified immunity defense was invented by judges. When judges make law, they violate the Separation of Powers doctrine, and the Privileges and Immunities Clause of the United States Constitution. Plaintiff respectfully makes a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited." [Dkt. 24 at 52]. Regardless of qualified immunity's origins, this Court is bound by Fifth Circuit precedent and Supreme Court precedent—both which recognize qualified immunity.

have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12). And the clearly established law, must be "particularized" to the facts of the case before the Court—it should not be defined "at a high level of generality." *Id.* at 335 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 577 U.S. at 12 (internal quotation marks omitted). A Rule 12(b)(6) motion to dismiss based on qualified immunity is evaluated under the same pleading standards as a traditional Rule 12(b)(6) motion to dismiss. *See Terwilliger v. Reyna*, 4 F.4th 270, 279–80 (5th Cir. 2021).

## A.  Beaumont Police Department Defendants

According to the BPD Defendants, Plaintiff's 42 U.S.C. § 1983 claims against them should be dismissed because (1) there is no pleading by Plaintiff indicating that the BPD Defendants ever interacted with, or were personally involved with, or had custody or control over, Plaintiff in any way, or violated Plaintiff's Fourteenth or Eighth Amendment Constitutional rights; and (2) neither Plaintiff's pleadings, nor any potential evidence, can overcome the BPD Defendants' qualified immunity. [Dkt. 48 at 8]. The Court agrees, and grants the BPD Defendants' Motion to Dismiss because Plaintiff has failed to prove a clearly established right.

The BPD Defendants never interacted with Plaintiff; they arrested her attacker, Ms. Shelton. Nonetheless, Plaintiff alleges that the BPD Defendants failed to protect her, in violation of her Eighth and Fourteenth Amendment rights, by bringing Ms. Shelton to the jail—where she eventually attacked Plaintiff—instead of taking her to a mental health facility. [Dkt. 62 at 11–12]. To support this claim, Plaintiff cites several failure-to-protect cases. *See id.* at 12–13. But not one is analogous or supports her position. *See Farmer v. Brennan*, 511 U.S. 825, 829 (1994) (holding that "**a prison official** may be held liable under the Eighth Amendment for denying

7

humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it") (emphasis added); *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 191 (1989) (holding that "social workers and other local officials who received complaints that petitioner was being abused by his father and had reason to believe that this was the case, but nonetheless did not act to remove petitioner from his father's custody" did not deprive the petitioner of his liberty in violation of the Fourteenth Amendment); *Johnston v. Lucas*, 786 F.2d 1254, 1259 (5th Cir. 1986) (holding that **prison officials** are not liable for an inmate's injuries caused by another inmate if the prison officials acted with a standard of conduct less than "deliberate indifference") (emphasis added); *Stokes v. Delcambre*, 710 F.2d 1120, 1123–26 (5th Cir. 1983) (holding that a sheriff who was charged by the law with **control and supervision over the jail** "owed to his prisoner the constitutionally rooted obligation not to detain him in a manner which made it likely he would be beaten and sexually assaulted"); *Dyer v. Houston*, 964 F.3d 374, 383–85 (5th Cir. 2020) (holding that officers who "had custody of a delusional detainee who was severely harming **himself**, and yet—despite being aware of the **detainee's** dire condition—. . . did nothing to secure medical help" violated the **detainee's** clearly established constitutional rights) (emphasis added).

Plaintiff does not identify a single case where an officer was held to have violated the constitutional rights of someone who the officer never interacted with, had responsibility or control over, or even knew existed. Because Plaintiff failed to identify caselaw in which an officer, acting under similar circumstances as the BPD Defendants, was held to have violated the Constitution, the BPD Defendants are entitled qualified immunity.[5] *See Roque*, 993 F.3d at 334.

---

[5] *See also* discussion *infra* Section IV.

The 12(b)(6) Motion to Dismiss of Defendants Ryan M. Barfield, Alec H. Garcia, and John E. Poole [Dkt. 48] is therefore **GRANTED**.

## B.  County Jailer Defendants

The six County Jailer Defendants filed individual 12(b)(6) Motions to Dismiss asserting qualified immunity. [Dkts. 37–42].[6] They do not challenge the "clearly established" prong.[7] Rather, the Court must analyze whether Plaintiff's Complaint, [Dkt. 24], sufficiently pleads that the individual County Jailer Defendants' conduct violated Plaintiff's constitutional rights. Because the Complaint does not include adequate well-pleaded facts to state claims to relief against the individual County Jailer Defendants that are plausible on its face, the Court grants their Motions to Dismiss.

The Eighth Amendment's prohibition of "cruel and unusual punishments" imposes a duty on prison officials to protect prisoners from violence at the hands of other prisoners. *Williams v. Hampton*, 797 F.3d 276, 280 (5th Cir. 2015) (en banc) (citing *Farmer*, 511 U.S. at 832–34 (1994)); *see* U.S. Const. amend. VIII. "The constitutional rights of a pretrial detainee, on the other hand, flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). "Since the State does punish convicted prisoners, but cannot punish pretrial detainees, a pretrial detainee's due process rights are said to be 'at

---

[6] The bulk of the Defendants' Motions, [Dkts. 37–42], are identical to one another. Likewise, Plaintiff's Responses to each of the Motions, [Dkts. 66–71], are substantially identical to one another. Throughout this Opinion, the Court often cites, *e.g.*, to one filing for a premise that is repeated by each County Jailer Defendant, or for a premise that Plaintiff asserts as to each County Jailer Defendant.

[7] *See, e.g.*, [Dkt. 37 at 10–11] ("Plaintiff has failed to show that she was 'incarcerated under conditions posing a substantial risk of serious harm' so there is no Fourteenth Amendment violation. However, if this court finds otherwise, Plaintiff has failed to show that [individual County Jailer Defendant] acted with 'deliberate indifference to [Plaintiff's] health and safety.'"). Each County Jailer Defendant includes this same language in their individual motions. *See* [Dkt. 38 at 11–12; Dkt. 39 at 11; Dkt. 40 at 11; Dkt. 41 at 11; Dkt. 42 at 12].

least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

When, as in this case, "a pretrial detainee's claim is based on a jail official's episodic acts or omissions, the proper inquiry is whether the official had a culpable state of mind in acting or failing to act." *Cope v. Cogdill*, 3 F.4th 198, 206 (5th Cir. 2021) (citing *Hare*, 74 F.3d at 643). "An official 'violates a pretrial detainee's constitutional right to be secure in his basic human needs only when the official had subjective knowledge of a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference.'" *Id.* at 206–07 (quoting *Estate of Henson v. Wichita Cnty.*, 795 F.3d 456, 464 (5th Cir. 2015)).[8] "Although deliberate indifference is a high bar and requires egregious conduct, plaintiffs need not prove that the official acted with the intent to cause harm." *Id.* at 207 (citing *Farmer*, 511 U.S. at 835).

Essentially, the crux of Plaintiff's claims against the County Jailer Defendants is that they put Ms. Shelton in a holding cell with Plaintiff, and then failed to continuously monitor the cell, despite their knowledge that Ms. Shelton was violent and psychotic, and that Plaintiff was asleep and unable to defend herself. Plaintiff's claims are premised on several conclusory allegations, unwarranted factual inferences, and legal conclusions that she labels "reasonable inferences." The Court first addresses Plaintiff's general allegations that apply to all the County Jailer Defendants, and then addresses her individual allegations.

---

[8] Citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), Plaintiff asks the Court to apply an objective reasonableness standard rather than deliberate indifference. [Dkt. 24 at 48–49]. In *Kingsley*, the Supreme Court held that to prove an *excessive force* claim, a pre-trial detainee must show that the officer's use of force was objectively unreasonable. 576 U.S. at 391–92. This is not an excessive force case, however. Post-*Kingsley*, the Fifth Circuit has continued to apply the deliberate indifference standard when analyzing alleged violations of a pre-trial detainee's constitutional right to be secure in his basic human needs. *See Cope*, 3 F.4th at 206–07. Therefore, the Court applies the deliberate indifference standard here.

### 1. General Allegations

Plaintiff's claims fail because her Complaint, [Dkt. 24], does not include any well-pleaded facts to support her conclusion that the County Jailer Defendants knew that Ms. Shelton was violent and psychotic. First, she concludes that they knew she was "*potentially* violent because she was arrested for a violent crime." *E.g.*, [Dkt. 66 at 22] (emphasis added). True, someone who is arrested for a violent crime is *potentially* violent.[9] But not every person who is arrested for a violent crime is likely to commit unprovoked violent attacks on sleeping strangers, as Ms. Shelton did. And knowing that someone is "*potentially* violent" falls far short of the requisite "subjective knowledge of a substantial risk of serious harm." *See Cope*, F.4th at 206–07. Plaintiff also assumes that all the County Jailer Defendants knew from the BPD Affidavit that Ms. Shelton was violent and psychotic. [Dkt. 24 at 15]. She further concludes that "it is a reasonable inference that the officers orally informed the jailers at intake of the information in their probable cause affidavit, and likely expanded upon it, and that this information was circulated among the jailers on duty." *E.g.*, [Dkt. 66 at 22–23]. But no well-pleaded facts support an inference that the BPD Officers even completed the BPD Affidavit before the attack, let alone circulated it to each—or any—of the County Jailer Defendants. Indeed, Ms. Shelton attacked Plaintiff only forty-eight minutes after arriving at the jail, before either woman was fully booked. Likewise, the Complaint is devoid of well-pleaded facts that support Plaintiff's "inferences" regarding what information the BPD Officers told the County Jailer Defendants and what information the County Jailer Defendants circulated among themselves. In sum, the well-pleaded facts simply do not support an inference that any of the County Jailer Defendants were aware of Ms. Shelton's prior violent and psychotic conduct.

---

[9] The Court assumes *arguendo* that the County Jailer Defendants knew that Ms. Shelton was arrested for a violent crime. Plaintiff's Complaint does not include this as a well-pleaded fact. *See* [Dkt. 24].

Next, Plaintiff concludes:

> Given the several witness descriptions that Shelton was acting strangely, talking to people that were not there, bashing walls, threatening to hit her neighbors, and striking her child, it is a reasonable inference that Shelton was acting similarly when she arrived at the jail, and that all the Jailer-Defendants . . . observed this and concluded that Shelton was both mentally ill and violent.

*E.g.*, [Dkt. 66 at 22]. She also claims that Ms. Shelton was "acting aggressive and violent as to all persons she encountered: neighbors, children, police, and jailers alike." *Id.* But this is contradicted by Plaintiff's Complaint, which states: "Shelton was . . . transported to [the Jefferson County Correctional Facility] without incident." [Dkt. 24 at 13]. The Complaint also lacks any details of Ms. Shelton's pre-attack behavior at the jail other than that she "pace[d] back and forth and appear[ed] to be talking aloud" in the book-in area before she was changed into jail clothing and placed in the cell. [Dkt. 24 at 19]. While pacing and talking to oneself may be indicative of mental illness, these facts do not indicate that Ms. Shelton was acting violently, nor is it reasonable to infer that all people who suffer from mental illnesses are violent. It is also not reasonable to infer that Ms. Shelton acted violent and psychotic at the jail merely because she acted that way previously. The Court turns to Plaintiff's defendant-specific allegations.

## 2.  Paula Ogazi

According to the Complaint, County Jailer Defendant Paula G. Ogazi placed Plaintiff in the cell at approximately 9:43 P.M.  [Dkt. 24 at 31]. This is the only fact in the Complaint that involves Defendant Ogazi.[10] *See id.* Nonetheless, Plaintiff contends that Defendant Ogazi "clearly had duties, based on [her placing Plaintiff in the cell] and other entries in cell

---

[10] The cell observation log provided by the County Jailer Defendants, *see supra* n.3, indicates that Defendant Ogazi also checked Plaintiff's cell at 10:55 P.M. *See, e.g.*, [Dkt. 37-1]. Defendant Ogazi noted: "x1 appears asleep/x1 sitting in cell." *Id.* This was the last recorded cell check before Defendant Lowe discovered the attack. *See id.* While considering the additional cell check would not affect the Court's conclusion here, the Court notes that Plaintiff neglected to include it in her factual allegations. *See* [Dkt. 24].

12

observation logs to make appropriate observations"; that "she should have assured that continuous observation of Ms. Shelton occurred, or that Ms. Shelton be removed from the jail and transported to a mental health facility, or that Ms. Shelton be isolated in a single cell"; and that "she was deliberately indifferent to and acted in an objectively unreasonable manner regarding information she received regarding Ms. Shelton." *Id.* Plaintiff does not allege any facts from which the Court can reasonably infer that Defendant Ogazi had subjective knowledge that Ms. Shelton posed a substantial risk of serious harm to Plaintiff. *See Cope*, 3 F.4th at 206. Without such knowledge, Defendant Paula Ogazi is entitled to qualified immunity. Therefore, her Motion to Dismiss [Dkt. 37] is **GRANTED**.

### 3. Brittany Banks

According to the Complaint, County Jailer Defendant Brittany A. Banks was present when Ms. Shelton arrived at the jail. [Dkt. 24 at 19]. Defendant Banks also allegedly ran the Continuity of Care Query on Ms. Shelton. *Id.* Plaintiff alleges that Defendant Banks learned from the Query that "Ms. Shelton had received care previously for what, upon information and belief, [Defendant Banks] understood as being significant mental health issues"; that Defendant Banks transmitted this information to other County Jailer Defendants; and that the County Jailer Defendants "did nothing in response" to receiving this information. [Dkt. 24 at 19–20]. The Complaint also provides that Defendant Banks witnessed and interrupted the attack:

> Jailer Banks indicated in an incident report that, on July 16, 2020, at approximately 11:03 PM, she saw Jailer Lowe signing isolation sheets on cell doors. When Jailer Lowe stepped to the door of cell B-8, he yelled to Jailer Banks that an inmate was being beaten up. Arri was the inmate. Jailer Banks, who wrote that she was working her assigned position as IPU officer at the Jefferson County Correctional Facility, wrote that she rushed from behind her desk when Jailer Lowe opened the cell door. Jailer Banks then saw Ms. Shelton "stomping on the head of white female Chavez, Arri." She also wrote that she immediately pulled Ms. Shelton away from Arri, and Ms. Shelton was removed from the cell. Jailer Banks also saw that Arri

> was not moving and her face was covered in blood. After EMTs
> arrived, Jailer Banks noted that Arri was taken to St. Elizabeth
> hospital.

[Dkt. 24 at 20]. Plaintiff does not plead any other facts involving Defendant Banks.

Plaintiff essentially claims that because Defendant Banks knew that Ms. Shelton previously suffered from mental health issues, she had subjective knowledge that Ms. Shelton posed a substantial risk of serious harm to Plaintiff, and responded to that risk with deliberate indifference by not putting Ms. Shelton in a separate cell, transferring her to a different facility, or ensuring continuous monitoring of the cell. But as previously discussed, knowledge that an individual previously suffered from mental health issues is not knowledge that the individual will likely commit random acts of violence on helpless strangers.[11] Moreover, the question here is not whether Defendant Banks *should have* drawn the conclusion that Ms. Shelton posed a substantial risk of harm to Plaintiff. The question is whether Defendant Banks *had subjective knowledge* of that risk, and responded to it with deliberate indifference. *See Cope*, 3 F.4th at 206. Nothing in the Complaint supports such a conclusion. To the contrary, Defendant Banks' reaction to the attack indicates that she did *not* respond to the risk of harm with deliberate indifference. *See* [Dkt. 24 at 20]. Qualified immunity protects Defendant Brittany Banks from Plaintiff's claims. Therefore, her Motion to Dismiss [Dkt. 38] is **GRANTED**.

### 4. Lisa Marshall

The only facts in the Complaint that involve County Jailer Defendant Lisa Marshall are that "[a]n isolation/observation record indicates that [Defendant Marshall] was one of the jailers charged with responsibility to make observations of the cell in which Ms. Shelton and [Plaintiff]

---

[11] There are no well-pleaded facts to support Plaintiff's conclusion that Defendant Banks transmitted the information about Ms. Shelton's mental health history to the other County Jailer Defendants. *See* [Dkt. 24 at 19–20]. Regardless, the Court would reach the same conclusion as it did for Defendant Banks: awareness of Ms. Shelton's mental health history does not create a reasonable inference that the County Jailer Defendants had subjective knowledge that Ms. Shelton posed a substantial risk of serious harm to Plaintiff, let alone that they responded to a substantial risk with deliberate indifference.

were incarcerated"; that the isolation/observation record "indicates that [Defendant Marshall] made a cell check at 10:37 P.M." the night of the attack; and that Defendant Marshall "wrote in the remarks section, next to the time and her signature, that one prisoner was sitting and one was lying down." [Dkt. 24 at 29]. Plaintiff argues that "due to her years of experience, [Defendant Marshall] knew that Arri could not be left to be subjected to the whims of a psychotic, violent inmate" but "[n]evertheless, upon information and belief, she took no action to assure that Ms. Shelton was separated from Arri and/or that Arri was warned about Ms. Shelton's psychotic state and/or tendencies" or to "attempt to have Ms. Shelton removed from the facility and transported to a mental health facility." *Id.* Plaintiff concludes that Defendant Marshall's "actions and inactions" ultimately caused the attack. *Id.*

That Defendant Marshall observed one detainee sitting and one detainee laying in the cell approximately twenty-six minutes before the attack does not support a conclusion that she had subjective knowledge of the substantial risk of harm that Ms. Shelton posed to Plaintiff. Without such knowledge, Defendant Lisa Marshall is entitled to qualified immunity. Therefore, her Motion to Dismiss [Dkt. 39] is **GRANTED**.

**5. Bradford Lowe Jr.**

Defendant Bradford Lowe Jr. is the county jailer who discovered Ms. Shelton attacking Plaintiff. [Dkt. 24 at 27]. According to the Complaint, which relies on Defendant Lowe's incident report, Defendant Lowe began making cell check rounds at 11:00 P.M. on the night of the attack. *Id.* at 28. When he arrived at Plaintiff and Ms. Shelton's cell, "he saw Ms. Shelton kicking [Plaintiff] in the face several times. He then opened the door and told Ms. Shelton to step away from [Plaintiff]" and "called for officers 'behind the desk' to assist him." *Id.* With

15

Defendant Banks, Defendant Lowe entered the cell and "restrained Ms. Shelton and removed her from her cell, so that the medical staff could respond and assist [Plaintiff]." *Id.* at 20.

Plaintiff also alleges that Defendant Lowe likely encountered Ms. Shelton earlier when the officers brought her into the book-in area. *Id.* at 19. The Complaint provides that while the officers walked up to the book-in desk, Ms. Shelton "pace[d] back and forth and appear[ed] to be talking allowed" while "[a] male jailer, likely Lowe" stood and watched her. *Id.*

As previously discussed, witnessing someone pacing and talking to themselves does not impute subjective knowledge that the person poses a substantial risk of serious harm to others. And Defendant Lowe's efforts to stop the attack as soon as he discovered it, *see* [Dkt. 24 at 28], negates a conclusion that he responded to the risk of harm with deliberate indifference. Qualified immunity protects Defendant Bradford Lowe, Jr. from Plaintiff's claims. Therefore, his Motion to Dismiss [Dkt. 40] is **GRANTED**.

### 6.  Sarah Cooper

Defendant Sarah Cooper is the county jailer who placed Ms. Shelton in Plaintiff's cell at 10:23 P.M.—approximately forty minutes before Ms. Shelton attacked Plaintiff. [Dkt. 24 at 20, 25]. Plaintiff alleges that "Jailer Cooper chose not to conduct continuous monitoring and/or assure that continuous monitoring [took] place, even though she was aware of Ms. Shelton's serious mental health issues and violent tendencies. Instead, she left [Plaintiff] helpless and asleep, subject to the horrific attack which predictably occurred." *Id.* at 20. Plaintiff concludes that Defendant Cooper "shirked her duties [to monitor Plaintiff and Ms. Shelton's cell] and was deliberately indifferent," because Defendant Cooper allegedly failed to complete a Prison Rape Elimination Act document when booking Ms. Shelton. *Id.*

Plaintiff also alleges that Defendant Cooper "was listed as being the screening officer on Ms. Shelton's TCJS Screening Form for Suicide and Medical/Mental/Developmental Impairments" but that "there was no completion time and date listed on that form, as would be required by the TCJS." *Id.* at 21. Because the form indicates that "medical was notified regarding Ms. Shelton at 2:10 a.m. on July 17, 2020" Plaintiff concludes that "[c]learly the TCJS Intake Form, upon information and belief, was never completed before Ms. Shelton attacked [Plaintiff]"; that completion of the form "would have provided significant information to Individual County Defendants before the attack,"; and that "the failure to complete it was yet another cause of [Plaintiff's] damages." *Id.* at 21–22.

First, no factual allegations support Plaintiff's conclusion that Defendant Cooper was "aware of Ms. Shelton's serious mental health issues and violent tendencies." Second, Defendant Cooper's alleged failure to complete the Prison Rape Elimination Act document in the approximate forty-eight minutes between the time Ms. Shelton arrived at the jail and the time she attacked Plaintiff does not support a reasonable inference that Defendant Cooper shirked her responsibilities and was deliberately indifferent to Plaintiff's safety. Indeed, Plaintiff concedes that the attack occurred in the book-in area, and that inmates in the book-in area have not completed book-in or been through classification. [Dkt. 24 at 28]. And finally, even assuming *arguendo* that Plaintiff's assumptions regarding the TCJS form are reasonable inferences, there is no basis to conclude that Defendant Cooper acted with the requisite mental state. Plaintiff merely alleges that in hindsight, filling out the form "would have provided significant information to Individual County Defendants before the attack." There is no support for a conclusion that Defendant Cooper had subjective knowledge that her failure to fill out the TCJS form within forty-eight minutes of Ms. Shelton arriving at the jail would create a substantial risk

of serious harm to Plaintiff, let alone a conclusion that her failure to fill out the form reflected deliberate indifference to that risk.

Qualified immunity protects Defendant Sarah Cooper from Plaintiff's claims. Therefore, her Motion to Dismiss [Dkt. 41] is **GRANTED.**

### 7.  Aaron Morris Jr.

Defendant Aaron Morris Jr. is a Lieutenant jailer at the Jefferson County jail. [Dkt. 24 at 29]. Plaintiff claims that Lieutenant Morris is liable for both his individual and supervisory roles. The Court addresses each in turn.

#### i.  *Individual Role*

The only fact in the Complaint that references Lieutenant Morris is an allegation that he signed Ms. Shelton's TCJS form at 5:51 A.M. on the morning after the attack. *Id.* at 29–30. Plaintiff alleges that by signing the form after the attack, and not indicating on the form that it was not completed until after the attack, Lieutenant Morris "participated in an attempted cover-up of what occurred." *Id.* at 30. The Court cannot comprehend how Lieutenant Morris signing and dating the form on July 17, 2020, at 5:51 A.M. indicates an attempt to hide that the form was not completed on July 16, 2020.

Moreover, according to Plaintiff, the County Jailer Defendants' actions and inactions were the proximate and producing causes of her injuries. *Id.* at 51. But the only action she charges Lieutenant Morris with occurred the morning *after* she was injured; she does not allege that the "attempted cover-up of what occurred" caused any additional injury.

For both reasons discussed, Plaintiff's Complaint, [Dkt. 24], fails to state a plausible claim for relief against Lieutenant Morris for his individual role in the matter.

ii.     **Supervisory Role**

Plaintiff contends that it is "abundantly clear that Lieutenant [Morris] was in charge [when the attack occurred], as he signed two isolation/observation logs which were provided to Plaintiff by the County." [Dkt. 24 at 30]. She also reasons that "[h]is signature appears in the upper right-hand corner of both such documents, indicating by position and in context that he was in charge of the shift." *Id.* Plaintiff thus concludes that Lieutenant Morris is also liable for actions related to his supervisory role. *Id.* In her Response to Lieutenant Morris' Motion to Dismiss, Plaintiff makes several allegations against him that she did not make in the Complaint. *See* [Dkt. 70 at 20–25]. But these are the same allegations that the Court has already rejected as to the other County Jailer Defendants, and they fail for the same reasons that the Court has noted several times throughout this Opinion: the alleged facts do not support a conclusion that any of the county jailers—including Lieutenant Morris—had subjective knowledge of the substantial risk of harm Ms. Shelton posed to Plaintiff. Moreover, the County Jailer Defendants checked Ms. Shelton and Plaintiff's cell six times in the approximate forty minutes they were celled together. *See* [Dkt. 37-1]. Plaintiff insists that anything short of continuous monitoring amounts to deliberate indifference. *See, e.g.*, [Dkt. 66 at 25–26]. Given that the facts do not indicate that the County Jailer Defendants had subjective knowledge of the risk Ms. Shelton posed, Plaintiff demands an unreasonable bar. *See Rhyne v. Henderson Cnty.*, 973 F.2d 386, 393 (5th Cir. 1992) ("The difference between frequent periodic checks and 'continuous observation' is one of degree. Without evidence showing that the higher level of care was obviously necessary, we cannot see how the jury could conclude that the lower level of surveillance was deliberately

indifferent.").[12] Qualified immunity protects Defendant Aaron Morris Jr. from Plaintiff's claim against him for his supervisory role in the matter.

Defendant Aaron Morris Jr.'s Motion to Dismiss [Dkt. 42] is **GRANTED**.

### 8. Leave to Amend

Plaintiff requests that the Court grant her leave to amend her Complaint if it does not withstand the County Jailer Defendants' 12(b)(6) Motions. *See, e.g.*, [Dkt. 68 at 30]. Specifically, she would like to amend her Complaint: (1) to allege facts that she discovered from video footage she reviewed after filing the Complaint; and (2) to assert the theory of bystander liability. The Court addresses each in turn.

#### i.   *Video Footage Evidence*

##### a.   *Gaps in Footage*

Plaintiff alleges that video footage she viewed after filing her Amended Complaint contains "significant gaps,"

> which omit portions of the time when Shelton is in the cell alone with Arri. Moreover, the angle of the video, from the hallway facing the cell, allows the cell door to block any view of Arri lying on the floor. Therefore, as a result of both the gaps in the video and the viewing angle, it is impossible for Plaintiff's counsel to determine Arri's physical condition prior to the first assault noted in the probable cause affidavit, i.e., kicking Arri in the head 13 times.

*Id.* at 31. Plaintiff speculates that "it seems highly unlikely that [Plaintiff] would have remained motionless when Shelton began kicking her in the head" and that it is "much more likely that [Plaintiff] would have attempted to rise to defend herself or to retreat to another portion of the

---

[12] *Rhyne v. Henderson County* arrived at the Fifth Circuit on appeal from a direct verdict, 973 F.3d at 388, whereas this case is at the 12(b)(6) stage. Nonetheless, it is instructive. If a jury cannot conclude that a lower level of surveillance was deliberately indifferent without evidence showing that the higher level of care was obviously necessary, *see id.* at 393, it follows that to state a plausible claim that surveillance frequency amounted to deliberate indifference, a plaintiff must plead facts indicating that the higher level of care was necessary. Plaintiff fails to do so.

cell and call for help," or "[a]t the very least one would expect [Plaintiff] to have turned to the wall and covered her head with her arms." *Id.* at 31–32. She ultimately concludes that "[t]he likely explanation for why [Plaintiff] is not seen earlier is that she had already been attacked by Shelton and immobilized before the first assault noted in the probable cause affidavit" and that the County Jailer Defendants did not note that she had been assaulted previously because their observations "were too curious and superficial to determine [Plaintiff's] true condition." *Id.* at 32. Plaintiff's "likely explanation" is wholly speculative, however, and contains too many unwarranted factual inferences to survive a Rule 12(b)(6) motion. Plaintiff's request for leave to amend her Complaint to include these allegations is therefore denied.

### b. *Response Time*

Plaintiff also alleges that the video footage "reveals that the Jailer-Defendants were slow to react and delayed responding before physically separating Shelton from [Plaintiff]" and that "[t]heir failure to immediately respond allowed Shelton to commence the sixth, and perhaps most injurious assault noted in the probable cause affidavit, i.e., Shelton twice slamming [Plaintiff's] head against the concrete floor." *Id.* at 31. According to Plaintiff, the video footage shows:

> Although Jailer-Lowe was first to discover Shelton's ongoing attack on [Plaintiff], he was the second jailer to actually enter the cell after Jailer Banks. Even after Lowe opened the cell door, despite having just witnessed and shouted to Banks and other jailers that an assault was in progress, neither Jailer Lowe, Jailer Banks, nor any other jailer immediately entered the cell to physically separate Shelton from [Plaintiff] to prevent further harm. Additionally, it appears that no jailer instructed or urged Lowe to immediately enter the cell and protect [Plaintiff]. Instead, video shows that Jailer-Lowe stood outside the cell after opening the door, delayed entering and then backed up, apparently waiting for Jailer Banks to walk to the cell door from her station in a partially closed room across the hall from the cell. By the time Jailer Banks reached the cell door, Shelton had again approached [Plaintiff], this time grabbing her hair and twice slamming her head against the concrete floor. Only then did Jailer Lowe follow

Banks into the cell to physically separate Shelton from [Plaintiff].
A third jail employee who also witnessed Shelton resume her
attack, immediately left the area and did not enter the cell to help.

*Id.* at 31–32.

The Court grants Plaintiff's request for leave to amend her Complaint to allege these facts.[13] But because these facts only implicate County Jailer Defendants Bradford Lowe Jr. and Brittany Banks, the Court dismisses the other defendants with prejudice.

### ii.   *Bystander Liability*

Plaintiff also requests leave to file a Second Amended Complaint to "assert the theory of bystander liability in the alternative." [Dkt. 66 at 32]. Specifically, that "[i]n the event it is determined that any Jailer-Defendants is not liable initially for failing to take action to protect [Plaintiff] from Shelton, they would nonetheless be liable as bystanders as a result of observing that a violent, psychotic detainee had been confined in a cell with a sleeping detainee, thereby clearly endangering the sleeping detainee." *Id.* But as previously discussed, there is no basis for an inference that any of the County Jailer Defendants had subjective knowledge of Ms. Shelton's violent and psychotic tendencies. Allowing Plaintiff to amend the Complaint to assert the theory of bystander liability would be futile. Plaintiff's request for leave to add bystander liability is denied.

### IV.   MUNICIPALITY LIABILITY

Finally, the Court addresses the City's challenge to Plaintiff's *Monell* claim.[14] "Municipalities are not liable for the unconstitutional actions of their employees under

---

[13] The Court's grant of leave to amend should not be interpreted as indicating whether these alleged facts can overcome qualified immunity.

[14] A *Monell* claim is a municipality liability claim brought under 42 U.S.C. § 1983. In its Rule 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint, the City purports to seek dismissal of Plaintiff's state law tort claims and her *Monell* claim. [Dkt. 59 at 8, 10]. Because Plaintiff does not bring any state law tort claims against the City, *see* [Dkts. 24 at 47–52; 85 at 8], the Court only addresses the City's challenge to Plaintiff's *Monell* claim.

respondeat superior." *Groden v. City of Dall.*, 826 F.3d 280, 283 (5th Cir. 2016) (citing *Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)). But that does not mean municipalities are immune from Section 1983 liability. To establish a claim for municipality liability under *Monell*, "a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). "The three attribution principles identified here—a policymaker, an official policy and the 'moving force' of the policy—are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001).

Generally, "a state official has no constitutional duty to protect an individual from private violence." *McClendon v. City of Columbia*, 305 F.3d 314, 324 (5th Cir. 2002) (per curiam) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). An exception to this rule exists when the state—through incarceration, institutionalization, or other similar restraint of personal liberty—"restrains an individual's freedom to act on his own behalf." *Id.* (citing *DeShaney*, 489 U.S. at 200). When the state affirmatively exercises its power in this manner, it creates a "special relationship" with the individual affected. *Id.* This special relationship "imposes upon the state a constitutional duty to protect that individual from dangers, including, in certain circumstances, private violence." *Id.* (citing *DeShaney*, 489 U.S. at 200).

Here, no special relationship existed between Plaintiff and the City. Jefferson County, not the City, restrained Plaintiff's liberty through incarceration. The only connection between Plaintiff and the City is that the City's officials arrested Plaintiff's assailant. Because the City did not have a special relationship with Plaintiff, it did not have a constitutional duty to protect her

from Ms. Chavez's violence. Without such a duty, the City's officials could not have violated Plaintiff's constitutional rights by failing to protect her. *See McClendon*, 305 F.3d at 324. And it is "well established" that "every *Monell* claim requires an underlying constitutional violation." *Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017) (internal citation marks omitted). Plaintiff's Complaint therefore fails to state a *Monell* claim that is plausible on its face. Defendant City of Beaumont's Rule 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint [Dkt. 59] is therefore **GRANTED**.

## V.    CONCLUSION

It is therefore **ORDERED** that Defendants Ryan M. Barfield, Alec. H. Garcia, and John E. Poole's 12(b)(6) Motion to Dismiss [Dkt. 48], Defendants Paula G. Ogazi, Brittany A. Banks, Lisa L. Marshall, Bradford E. Lowe Jr., Sarah E. Cooper, and Aaron W. Morris Jr.'s 12(b)(6) Motions to Dismiss Plaintiff's First Amended Complaint [Dkts. 37–42], and Defendant City of Beaumont's Rule 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint [Dkt. 59] are hereby **GRANTED**. The Clerk of Court is **INSTRUCTED** to terminate these parties as defendants in this matter.

It is further **ORDERED** that Plaintiff Arri Nicole Chavez's claims against Defendants Ryan M. Barfield, Alec. H. Garcia, John E. Poole, Paula G. Ogazi, Lisa L. Marshall, Sarah E. Cooper, Aaron W. Morris Jr., and City of Beaumont are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Plaintiff Arri Nicole Chavez's claims against Defendants Bradford Lowe Jr. and Brittany A. Banks are **DISMISSED WITHOUT PREJUDICE**. The Court grants Plaintiff leave to amend her Complaint [Dkt. 24] to add the response time allegations,[15] **within thirty days of the date of this Order**.

---

[15] *See* discussion *supra* Section III.B.8.i.b.

It is further **ORDERED** that the stay on discovery is hereby lifted. The Court notes that following this Order, only Plaintiff's claims against Defendant Jefferson County remain in this matter.

      **IT IS SO ORDERED**.

          **SIGNED this 21st day of March, 2023.**

*Michael J. Truncale*
Michael J. Truncale
United States District Judge